IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.  3:19-CR-54 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES G. CARR |
| | ) | |
| v. | ) | |
| | ) | **GOVERNMENT'S SENTENCING** |
| JORDAN COFFMAN, | ) | **MEMORANDUM** |
| | ) | |
| Defendant. | ) | |

_____

### I.      Procedural Background

Defendant entered a guilty plea on October 21, 2019 to Possession of Child Pornography

in violation of 18 U.S.C. § 2252(a)(4) and (b)(2).  There is no mandatory minimum for the

offense.  The maximum prison term is 20 years because the Defendant's collection included

prepubescent children.  The guideline range in this case after acceptance is 78-97 months, far

lower than comparable pornography offenses coming before this Court.  The government

advocates a guideline sentence.

### II.     Argument

While the defense claims that the Defendant deserves a reduced sentence based on

childhood sexual abuse, diagnosis of PTSD (<u>after</u> the indictment in this case), and current

depression for which he takes medication (doc. 22, PageID 85), those are not at all unusual in

child pornography cases and defendants with those very same issues or conditions have

1

nonetheless, been sentenced to lengthy prison terms for possession of child pornography. *United States v. Harris*, 790 F. App'x 673, 679 (6th Cir. 2019) (80-month sentence for possession of child pornography despite defendant's childhood trauma, upstanding conduct in other areas of his life, and the professional, psychological, and emotional difficulties he faced as an adult); *United States v. Rigsby*, 445 F. App'x 838, 839–40 (6th Cir. 2011) (60-month sentence for possession of child pornography despite defendant's depression and hearing impairment); *United States v. Elmore*, 743 F.3d 1068, 1073 (6th Cir. 2014) (51-month sentence for possession of child pornography where defendant, who was college-age at the time of the offense, had suffered traumatic child sexual abuse). Age, health, and family circumstances are generally not enough, per se, to justify a departure or variance. *United States v. Rothwell*, 847 F.Supp.2d 1048, ¶ 11 of syllabus (E.D.Tenn.2012). Likewise, even <u>severe</u> depression is not a sufficient basis for a downward departure under U.S.S.G. § 5K2.13 (*United States v. Phillips*, 383 Fed.Appx. 527 (6th Cir.2010)), nor are blanket claims of future victimization in prison. *Rothwell, supra,* at 1063.

Additionally, to the extent the defense notes the Defendant's full time employment and lack of criminal record, many defendants have also had those same factors and still been sentenced to prison terms for possession of child pornography. *United States v. Grossman*, 513 F.3d 592 (6th Cir.2008) (66-month sentence for possession of child pornography where defendant had no prior record and led an otherwise law-abiding life); *United States v. Myers*, 442 F. App'x 220 (6th Cir. 2011) (60-month guideline sentence for possession of child pornography notwithstanding defendant's otherwise exemplary life, lack of record, and military service); *United States v. Haworth*, 187 F. App'x 458, 463 (6th Cir. 2006) (41-month guideline sentence for possession of child pornography despite defendant's unblemished criminal history, previous full-time employment, and military service). The lack of a criminal record is <u>already</u> factored

2

into the Defendant's guideline computation; he does not deserve more credit for it.

In fact, the Sixth Circuit has explicitly reversed several reduced child pornography sentences, including one of the cases the Defendant cites in support of his plea for a reduced sentence, where too much weight was placed on the defendant's personal circumstances. *United States v. Bistline*, 665 F.3d 758, 767 (6th Cir.2012) (defendant's age, health problems, status as his wife's caretaker, and lack of record); *United States v. Christman*, 607 F.3d 1110, 1119-20 (6th Cir.2010) (defendant's health problems, status as his mother's caregiver, remorse, profession, and pretrial compliance); *United States v. Camiscione II*, 591 F.3d 823, 833-34 (6th Cir.2010) (defendant's epilepsy and co-habitation with his mother).  While the Defendant cites the district court case of "*United States v. Camiscione*, Case No. 5:04CR594," in his Sentencing Memorandum in support of a reduced sentence—which was a one-day custodial sentence followed by 16 weekends of intermittent confinement in *Camiscione* —"due to a similar offense and similar criminal history," (doc. 22, PageID 101), the Sixth Circuit in *Camiscione II, supra*, later reversed the district court's sentence.  Hence, *Camiscione* should not guide the Court's sentencing in this case.

Defendant next claims that he was young and impulsive due to childhood trauma.  The defendant in *Elmore, supra,* made a similar argument:  that his childhood sexual abuse had left him psychologically damaged (and thus less able to control his impulses), thereby warranting a lower sentence.  *Elmore, supra*, at 1073.  However, the Court noted that while this may make the defendant less morally culpable than a psychologically undamaged person whose choice to break the law was fully volitional, "this circumstance cuts the other way as well" and hence requires a lengthier sentence for deterrence and public protection under 18 U.S.C. § 3553(a)(2)(B)-(C).  *Id.*

> Elmore's psychologically damaged state, manifested through non-contact pedophilia, "instability of [ ] interpersonal relationships, ... together with

3

> episodic alcohol abuse and impulse control problems," may be seen to reduce his moral culpability, but it also arguably leaves Elmore at an "elevated risk of re-offense." This dichotomy is reflected in the district judge's concern about "punish[ing] him more because of how he's been victimized," and it was not immediately obvious how it could be reconciled in Elmore's case. The district judge chose to strike a balance that gave Elmore some credit for his unfortunate past (in the form of a below-guidelines sentence and treatment recommendation) but also accounted for the harmful character traits produced by that past. *Id.*

Thus, the Defendant in this case cannot have it both ways—so traumatized that he deserves less prison without the Court then having to accept that this very fact makes him <u>more</u> of a danger to the public and in <u>more</u> need of personal deterrence for his purported impulsivity.

Regardless, the government disputes the assertion that this was an impulsive crime or that the Defendant acted impulsively when committing the crime of possession of child pornography. Unlike *Johnson v. Texas*, 509 U.S. 350, 113 S.Ct. 2658 (1993) cited by the defense (doc. 22, PageID 92) which involved impulsive violence, child pornography offenses involve sexual deviance and <u>countless</u> intentional and knowing acts over countless occasions. The images and videos of child pornography, which if not produced personally by the defendant, must be located online before they can even be viewed. Child pornographers must know where to go to find what they want and because they tend to like certain types of child pornography acts and/or victims, they must sift through all of the available child pornography they come across to find what they like for downloading or viewing. Defendant must have downloaded the child pornography images and videos in this case to his computer and stored them in folders on his device in order for him to have been in possession of them on his device when law enforcement arrived August 13, 2015. However, to be clear, the Defendant was observed accessing child pornography online on February 25, February 28, and March 2, 2015. In other words, the evidence proves that the Defendant was viewing, downloading, and storing child pornography

4

for at least 6 months, possibly longer. Since he refused to speak to agents about his offenses, we will never truly know how long he was engaged in this activity altogether. Yet, it is clear that the Defendant's child pornography activity spanned many months and thus, involved many knowing and purposeful steps. Thus, the impulsivity argument does not bear scrutiny.

In addition, while the Defendant may have accepted responsibility to the PSR writer, he did not once admit wrongdoing in the investigation. On the contrary, he invoked and advised, "I see no gain in making incriminating statements." (PSR, doc. 20, PageID 64). Although he certainly has that right, he does not then get to claim that he cooperated with law enforcement. Many child pornography defendants do cooperate and almost view the arrival of law enforcement as a long-awaited acknowledgement of this abhorrent part of their life, but this Defendant did not. Likewise, by refusing to take a polygraph (PSR, doc. 20, PageID 64)—which he certainly has the right to refuse—we will never truly know whether he committed hands-on conduct of minors. Thus, the government takes his denial of no hands-on conduct with minors with the skepticism it deserves from someone who deceived everyone he knew, including his own mother with whom he resided, about his child pornography activities.

Also deeply concerning is the fact that the Defendant denies having a sexual interest in children. (*Id.* at PageID 65). Possession of child pornography is a crime committed precisely because of a sexual attraction to children. It defies logic to claim otherwise. At a minimum, it involves an interest in deviant sex. In fact, possession of even child erotica indicates an interest in deviant sex *(Rothwell, supra*, at 1061), and the Defendant here also possessed child erotica. (PSr, doc. 20, PageID 65). The fact that the Defendant is not capable of admitting to this simple fact should raise all kinds of red flags for the Court; after all, the first step to any rehabilitation is the Defendant admitting that he has a problem—in this case, a sexual interest in children.

By failing to acknowledge his deep-seated sexual deviance, the Defendant demonstrates that there is an even greater need for individual deterrence in this case.  As federal courts have noted, deterrence is "<u>crucial</u>" in the child pornography context, *United States v. Goldberg*, 491 F.3d 668, 672 (7th Cir.2007) (emphasis added), and should be given "<u>significant</u> weight at sentencing." *United States v. Goff*, 501 F.3d 250, 261 (3d Cir.2007) (emphasis added); *see also,* § 3553(a)(2)(B)-(C).  Federal Courts have also recognized that deterring future criminal behavior and protecting the public under § 3553(a)(2)(B) and (C) "should be focused upon the market for such activities." *Christman, supra*, at 1122-1123.  Moreover, the Sixth Circuit has rejected the defense claim that the "market theory" of general deterrence is inapplicable where a defendant had downloaded but not distributed child pornography.  *United States v. Widmer*, 511 F. App'x 506, 510 (6th Cir. 2013).  By viewing, downloading, and possessing child pornography, this Defendant not only perpetuated the market for child exploitation, he himself directly exploited the minors depicted, the most vulnerable in our society.  Therefore, a guideline range prison term is necessary to reflect the seriousness of his offense and relevant conduct, provide just punishment, and most importantly, afford adequate specific and general deterrence and protect children in the community and on the internet.

While the Defendant's circumstances are one factor the Court is to consider in determining a sentence—and certainly the factor the defense encouraged the Court to weigh the most heavily in its Sentencing Memorandum—the Court must also take into account the impact this Defendant's crime has had on the victims of the child pornography.  Although mistakenly described as a passive crime of sitting behind a computer, child pornography is in fact, an active crime because it adds to a victim's exploitation, humiliation, and emotional devastation, not just caused by the sex acts themselves but the continual viewing and re-distribution of the images of

6

it.  As victims have made clear, the abuse and production are something they are no longer forced to endure while the distribution and viewing of the child pornography endures forever.  In other words, what underline continues to victimize and debilitate them is the perpetual viewing and re-distributing of their sexual abuse.

Much research has been done on the grave harm childhood sexual abuse inflicts on its victims but too few understand or fully appreciate the irreparable harm done to victims of child pornography from distribution of the images.  As the United States Sentencing Commission stated in its 2012 report to Congress on the subject:

> "Child pornography victims face other types of victimization that are separate from the harm of production.  Even after the physical abuse has ended, child pornography victims suffer due to the continued circulation of their images or the ongoing potential for circulation of their images.  U.S. Sentencing Commission, Report to Congress: Federal Child Pornography Offenses (Dec. 2012) (Chapter 5 – Victims of Child Pornography) at 112.

There is a much greater "long-term risk to the child of depression, guilt, poor self-esteem, feelings of inferiority, interpersonal problems, delinquency, substance abuse, suicidal thoughts, and post-traumatic stress disorder than [for] other child sexual assault victims."  *Id.* at 113.

Another harm unique to child pornography victims is the fear that their images will be used to groom other children, to "normalize" the abuse behavior.  *Id.*; *see also*, National Society for the Prevention of Cruelty to Children, Images of Abuse: A Review of the Evidence on Child Pornography (2006), p. 4.  Sadly, their fear is not unfounded since their perpetrators often did the same thing with them.  Although they do not bear responsibility for their abuse, its production or any subsequent use of it to groom the next crop of child victims, victims of child pornography nonetheless, do.  They live with the guilt of knowing that they will likely be used as involuntary accomplices in future crimes against children just by virtue of having been victims of production and its continued distribution.

Of additional fear and terror is that of being recognized and harassed by current child pornography consumers.  The nameless, faceless masses remain free and with the internet, able to access, view, and re-distribute the images easily; whereas, the victims of child pornography will never be able to know at any time who around them has seen their images or what they may do if recognized.  For many, this has caused an agoraphobic inability to leave their homes unless in the company of a trusted person; for most, it hampers them from living anything approximating a normal life.  Not surprisingly, that was exactly what the victim of the "Mt. Lime" series experienced after her abuse and discovery that her images were being traded online.

> [She] exhibits severe symptoms of anxiety, depression, and post-traumatic stress disorder, which may increase during stressful periods for the remainder of her life (particularly during periods that involve relationship milestones or sexual behavior).
>
> *          *          *          *
>
> For each step she takes to create a new life, the conduct of the Defendant and others like him cause her to relapse and experience the trauma all over again. She will never be able to fully heal from the trauma of knowing that her prepubescent pornographic images are being viewed for the sexual gratification of strangers.  (See Letter from attorney, Emma Lanzon, representing "Mt. Lime" series victim).

Simply put, the lives of child pornography victims are irrevocably altered, not simply by the sexual abuse itself, but by the perpetuation and re-viewing of the images of that abuse by people like this Defendant.

The defense in child pornography cases will often cite as justification for a lower sentence, be it under § 3553(a) or a departure theory, that the Defendant did not touch any of the minors or produce any of the child pornography; however, the Sixth Circuit has previously rejected such arguments.  "[It] is not logical to justify a more lenient sentence on the basis that [the defendant] did not make or distribute child pornography or molest a child."  *United States v. Camiscione*, 591 F.3d 823, 834 (6th Cir. 2010); *see also*, *United States v. Bistline*, 665 F.3d 758,

8

765 (6th Cir. 2012) ("That the producers of child pornography are more culpable ... does not mean that its knowing and deliberate possessors are barely culpable at all.").  The impact on the victims of the child pornography from the possession of the images and videos is the same whether it is this Defendant or their original abuser/producer.  In other words, the Defendant should not get credit for having <u>not</u> committed additional, more serious crimes.  The guidelines do not reward a child pornographer for <u>not</u> molesting a child—rightfully so. Neither should this Court.

**III.    JVTA Assessment**

Under 18 U.S.C. § 3014, the Defendant is also subject to a mandatory $5,000 Additional Special Assessment.  The statute states, in pertinent part:

> Beginning on the date of enactment of the Justice for Victims of Trafficking Act of 2015 and ending on September 30, 2019, in addition to the assessment imposed under section 3013, **the court shall assess an amount of $5,000 on any non-indigent person or entity convicted of an offense under**—
>
> (**1**) chapter 77 (relating to peonage, slavery, and trafficking in persons);
> (**2**) chapter 109A (relating to sexual abuse);
> (**3**) **chapter 110 (relating to sexual exploitation and other abuse of children)**;
> (**4**) chapter 117 (relating to transportation for illegal sexual activity and related crimes)....

18 U.S.C. § 3014(a) (emphasis added). These assessments are deposited in the Domestic Trafficking Victims' Fund and awarded as grants or enhanced programming for victims. 18 U.S.C. §§ 3014(c) and (e)(1).  Because the Defendant has been convicted of an offense under Chapter 110, the Court must impose this additional special assessment unless it finds he is unable to pay; however, both the Defendant's current and <u>future</u> financial status is to be evaluated when making the indigency determination under § 3014.  *United States v. Janatsch*, 722 F. App'x 806, 810-811 (10th Cir. 2018).  That is, negative net worth at the time of sentencing is not dispositive of the issue.  *United States v. Kelley*, 861 F.3d 790, 801-802 (8th Cir. 2017).  In fact, the Defendant

9

boasted in his Sentencing Memo that he "maintained employment until the time of his arrest," thereby demonstrating his clear capacity to work both in prison and beyond prison.  (Doc. 22, PageID 100).  If "at some point" the Defendant would be able to pay the Additional Special Assessment, "[t]his ability to earn money in the future preclude[s] a finding of indigence for purposes of § 3014."  *Janatsch, supra*, at 810-811.

While serving what could be a maximum of 20 years, Defendant may participate in the Bureau of Prisons' Inmate Financial Responsibility Program ("IFRP").  The whole purpose of the IFRP is to encourage federal offenders to pay court-ordered financial obligations while incarcerated.  The Bureau of Prisons requires all medically fit inmates to work, it collects debt payments from the inmates' trust fund accounts, and earnings from prison work assignments. Defendant, whom the defense has repeatedly noted is only 24 years old, reported no physical problems preventing him from working and in fact, was working full time at the time of the offense.  (PSR, Doc. 20, PageID 68-69).   Thus, he is certainly able to work for many decades, whether in prison or following prison.  Given that the Defendant has employability in the institution and beyond, he has a future ability to pay court-ordered obligations, and therefore, is not considered indigent for purposes of 18 U.S.C. § 3014 even if currently insolvent.

**IV.    Restitution**

Restitution is mandatory in this case pursuant to 18 U.S.C. § 2259, the Mandatory Restitution for Sexual Exploitation of Children Act, for the "full amount" of the victims' losses, including "any costs incurred by the victim for—

(A) medical services relating to physical, psychiatric, or psychological care;

(B) physical and occupational therapy or rehabilitation;

(C) necessary transportation, temporary housing, and child care expenses;

(D) lost income;

(E) reasonable attorneys' fees, as well as other costs incurred; and

(F) any other losses suffered by the victim as a proximate result of the offense."[4]

A court does not have discretion to decline restitution under the statute for any reason, including the defendant's "economic circumstances" or the fact that the victim has been otherwise compensated for her injuries.  18 U.S.C. § 2259(4)(B)(i)–(ii).

There has been one restitution request made in this case, which was submitted after the Final Copy of the PSR had been filed on January 15, 2020.  The victim is in the identified series, "Mt. Lime."  Her Jones Day attorney has submitted almost 150 pages of supporting documentation, including a psychological examination/report and breakdown of the amount of money this victim has already been forced to spend due to her victimization.  The government refers the Court to those extensive documents in support of the restitution request in the amount of $80,342.70.  (See Letter from attorney, Emma Lanzon, representing "Mt. Lime" series victim).  This amount is entirely justified given that the victim has, to date, spent the following just to try to prevent Defendants like this one from accessing her images online:  $29,390.50 since September 2015 on various services to make it more difficult to find and download her images online; $549.99 nearly every month since January 2016 to another company that specializes in managing unwanted Google search results (again, to make it more difficult to find her images online); an additional $3,780.93 to another takedown company in an on-going effort to remove her images from the internet; and finally, between $109.70-$777.05 annually to own the domain name and copyrights to various websites associated with her name.  This does not even include therapy expenses, currently (under) valued at $10,530, or attorney's fees.  The government would also emphasize that this is the only restitution request Defendant is facing.

Therefore, the government requests a restitution order in the amount of $80,342.70 for the victim of the "Mt. Lime" series, payable to her counsel, Emma J. Lanzon, Jones Day, 77 W. Wacker Drive, Chicago, Illinois 60601.

**V.      Conclusion**

For all of those reasons, the Court should sentence Defendant to a prison term within his guideline range and order him to pay the $5,000 JVTA assessment and restitution in the amount of $80,342.70 for the victim of the "Mt. Lime" series, c/o the victim's attorney, Emma J. Lanzon, Jones Day, 77 W. Wacker Drive, Chicago, Illinois 60601.

Respectfully submitted,

JUSTIN E. HERDMAN
United States Attorney


By: */s/ Tracey Ballard Tangeman*
Tracey Ballard Tangeman (0069495)
Assistant U.S. Attorney
Toledo, Ohio 43604
Telephone: (419) 259-6376
Facsimile: (419) 259-6360
E-mail: Tracey.Tangeman@usdoj.gov


CERTIFICATE OF SERVICE

I hereby certify that on February 24, 2020 a copy of the foregoing was filed electronically and notice will be sent to all parties by operation of the Court's electronic filing system.

*/s/ Tracey Ballard Tangeman*
Tracey Ballard Tangeman
Assistant U.S. Attorney